FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

IN ADMIRALTY

CASE NO.

2006 OCT 25  A 10: 17

3:06-cv-936-J-12MCR

D R FREED. INC. d/b/a
DANATUGS.COM,

       Plaintiff,

vs.

CARNIVAL CORPORATION,
a Panamanian Corporation d/b/a
CARNIVAL CRUISE LINES;
*M/V Miracle, in rem*; and
JACKSONVILLE ELECTRIC
AUTHORITY,

       Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiff, D R FREED, INC. d/b/a DANATUGS.COM (hereinafter "DANATUGS"), sues

Defendants, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINES (hereinafter

"CARNIVAL"), *M/V Miracle, in rem*, (hereinafter "*Miracle*" or "Vessel") and the

JACKSONVILLE ELECTRIC AUTHORITY (hereinafter "JEA"), and alleges:

    1.    This suit involves various causes of action for assorted maritime torts and breach

of an oral maritime contract and is within this Court's admiralty and maritime jurisdiction

pursuant to Title 28 U.S.C. § 1333.

    2.    Plaintiff, DANATUGS, invokes Rule 9(h) of the Federal Rules of Civil

Procedure and elects to proceed under this Court's admiralty jurisdiction.

3.      At all material times hereto, Plaintiff, DANATUGS, was and is a Florida corporation that maintains its principle place of business in Broward County, Florida.

4.      At all material times hereto, Plaintiff, DANATUGS, was and is engaged in providing tug and barge services for hire upon the navigable waters of the United States, including the navigable waters in and around Jacksonville, Florida.

5.      At all material times hereto. Plaintiff, DANATUGS, was the demise charterer of the Barge *Cape Cod*. which was and is a 250-foot x 72-foot x 16-foot, 1.7 million gallon capacity barge.

6.      At all material times hereto, Defendant, CARNIVAL. was and is a Panamanian corporation that maintains its principle place of business in Miami-Dade County, Florida.

7.      At all material times hereto, Defendant, CARNIVAL, was and is engaged in the pleasure cruise business under the Trademark of CARNIVAL CRUISE LINES and authorized to transact business in the State of Florida.

8.      At all material times hereto, *in rem* Defendant, *M/V Miracle*, was and is a foreign flagged, ocean going, passenger vessel that is owned, chartered and/or operated by Defendant, CARNIVAL. The *in rem* Defendant Vessel's Protection and Indemnity Club. The West of England Ship Owners Mutual Insurance Association (Luxembourg) S.A., has given a letter of undertaking dated December 15, 2005 to respond to the claims asserted herein in the amount of Two Hundred Eighty Thousand Six Hundred Ninety Three and 24/100 Dollars ($280,693.24). A copy of the letter of undertaking is attached hereto as Exhibit "A." The *in rem* Defendant Vessel's Protection and Indemnity Club has agreed to post the attached letter of undertaking as substitute security to secure the Court's *in rem* jurisdiction.

9.    From approximately February 2 through February 6, 2005, Defendant, *Miracle*, was docked on the navigable waters of the St. John's River in the City of Jacksonville, Florida for purposes of providing living accommodations in support of the 2005 NFL Superbowl, which was held in Jacksonville on February 6, 2005.

10.    Defendant, *Miracle*, is currently operating out of the Port of Tampa and will be within the jurisdiction of the United States District Court for the Middle District of Florida during the pendency of this action.

11.    At all material times hereto, Defendant, JEA, is a community-owned utility that operates electric, water and sewer systems in the City of Jacksonville and Duval County, Florida.

12.    Jacksonville Superbowl Host Committee, Inc., was incorporated in Florida as a not-for-profit organization for purposes of organizing the 2005 NFL Superbowl in Jacksonville, Florida.

13.    Due to the relatively limited amount of available hotel rooms, Jacksonville Superbowl Host Committee, Inc., (hereinafter "Host Committee"), purchased the passenger accommodations on board CARNIVAL'S *Miracle* and three Holland America cruise ships for the 2005 Superbowl Week for purposes of providing living quarters to people in support of the 2005 NFL Superbowl in Jacksonville.

14.    The Host Committee also contracted the Defendant, JEA, to provide various kinds of logistical support for the 2005 NFL Superbowl in Jacksonville.

15.    Part of the Host Committee's agreement with Defendant, JEA, required the JEA to remove and dispose of gray and treated black water (a/k/a treated sewage) from the CARNIVAL and Holland America cruise ships.

16.    Defendant, JEA, received several different bid proposals from waste

management companies regarding the disposal of the cruise ships' gray water, treated black water and garbage from the cruise ships during the 2005 Superbowl Week.

17.     Defendant, JEA, tentatively accepted a bid proposal from Waste Management, Inc. Waste Management tentatively agreed to hire Plaintiff, DANATUGS, as a subcontractor to use tugs and barges to move the cruise ships' gray and treated black water and solid garbage to intermediate transfer points on the St. John's River. Plaintiff, DANATUGS, was only to act as a means of transporting the waste water and garbage from the cruise ships to the designated transfer points. Waste Management was responsible for managing the overall environmental issues and the transportation of the waste water and garbage from the transfer points on the river to the final disposal sites on land.

18.     During the months leading up to the 2005 Superbowl Week, Waste Management allowed Plaintiff, DANATUGS', representatives to discuss cam lock fittings, hose sizes and barges' holding tank and discharge capabilities directly with Defendant, JEA'S, representatives. It was in this manner that Defendant, JEA, learned of Plaintiff, DANATUGS, existence and tentative role in the project.

19.     For reasons unknown to Plaintiff, DANATUGS, Waste Management backed out of its tentative deal with Defendant, JEA, a few weeks before the 2005 Superbowl Week.

20.     Defendant, JEA, was distressed at having its tentative waste disposal deal fall through with Waste Management on the eve of the 2005 Superbowl.

21.     Defendant, JEA, contacted Plaintiff, DANATUGS, and asked it to submit its own proposal for moving the waste water and garbage from the cruise ships to intermediate transfer points.

22.     During the negotiations, Plaintiff, DANATUGS, informed Defendant, JEA, that

it had to charter barges to conduct the project and that it would not be able to charter such barges if the cruise ships were going to discharge untreated sewage.

23.     Plaintiff, DANATUGS, asked Defendant, JEA, about the quality of the black water that was to be discharged from the cruise ships.

24.     Defendant, JEA, advised Plaintiff, DANATUGS, that only treated black water would be discharged from the cruise ships and that such water would be nearly clear and odorless.

25.     Defendant, JEA, also informed Plaintiff, DANATUGS, that the barges would not require any special cleaning or decontamination because the black water would be treated before the cruise ships discharged the water into the barges.

26.     Defendant, JEA, promised Plaintiff, DANATUGS, that it would pay for any clean up or decontamination expenses for the barges plus any additional unforeseen charges.

27.     Based on the Defendant, JEA'S, representations, Plaintiff, DANATUGS, orally contracted with JEA to move the gray and treated black water from the CARNIVAL and Holland America cruise ships to the JEA'S Kennedy Generating Plant on the St. John's River where the JEA said it would pump the gray and treated black water off of DANATUGS' chartered barges into the JEA'S sewage system. (Please note particular details about the oral contract between DANATUGS and JEA are alleged in Count VII below.)

28.     After the *Miracle* docked at its designated bulkhead on the St. John's River in Jacksonville on or about February 2, 2005, a meeting between CARNIVAL'S, JEA'S and DANATUGS' representatives was held on the Vessel to coordinate the discharge operation for the gray and treated black water. During the course of the aforementioned meeting, Defendant, JEA'S, representative confirmed with Defendant, CARNIVAL'S, representative that only treated

black water would be discharged from the *Miracle* to the *Cape Cod*. Plaintiff, DANATUGS',
representative was present and heard CARNIVAL'S representative confirm that the treated black
water would be nearly colorless and odorless when it would be discharged from the Vessel to the
Barge *Cape Cod*.

29.     Plaintiff, DANATUGS, relied on Defendants, CARNIVAL'S and *Miracle's*,
representations that only treated black water would be discharged when it secured the Barge
*Cape Cod* along side the Vessel and connected the discharge hoses from the Vessel's gray and
treated black water cam lock systems to the Barge.

30.     As explained in more detail below, on or about February 6, 2005 Defendants,
CARNIVAL and *Miracle*, pumped untreated, or improperly treated, black water from the
*Miracle* into the *Cape Cod*.

31.     Defendants, CARNIVAL'S and *Miracle's*, act of discharging untreated, or
improperly treated, black water into the *Cape Cod* contaminated the Barge with fecal coliform
and E coli, which caused Plaintiff, DANATUGS, to incur damages consisting of: (a) additional
charter hire for the Barge until it was cleaned and decontaminated; (b) clean up and
decontamination expenses for the Barge; (c) additional towing charges to move the Barge; (d)
environmental testing expenses for the Barge, and (e) additional charges relating to the delay in
returning the Barge and rented pump equipment to their respective owners.

32.     More particularly, Plaintiff, DANATUGS, was required to hire Cliff Berry, Inc.
to clean and decontaminate the Barge *Cape Cod* as a direct and proximate result of Defendants,
CARNIVAL'S and *Miracle's*, discharge of untreated or improperly treated black water into the
Barge. Cliff Berry, Inc. charged Plaintiff, DANATUGS, One Hundred Forty Two Thousand
Sixty Six and 35/100 Dollars ($142,066.35) for clean up and decontamination of the *Cape Cod*.

33.     In addition, Plaintiff, DANATUGS, had to pay additional charter hire to Sterling Equipment, Inc., which is the owner of the *Cape Cod*, because the Barge had to be cleaned and decontaminated before it could be returned to Sterling. Plaintiff, DANATUGS, paid Sterling Eighty Three Thousand One Hundred Seventy Five and No/100 Dollars ($83,175.00) for additional charter hire for the *Cape Cod*.

34.     Further, Plaintiff, DANATUGS, had to pay Diversified Environmental Laboratories, Inc.. Three Thousand Five Hundred Ten and No/100 Dollars ($3,510.00) to perform various tests to the *Cape Cod* for fecal coliform and E coli contamination.

35.     Plaintiff, DANATUGS, also had to pay Mobro Marine, Inc. approximately Eight Thousand Four Hundred Twelve and 50/100 Dollars ($8,412.50) for additional towing services for moving the *Cape Cod* on account of the contamination of the Barge, the delay in getting the Barge pumped out at the JEA'S Kennedy Generating Plant, and in moving the Barge for cleaning services.

36.     Plaintiff, DANATUGS, demise chartered two barges named *J Galli* and *Randi R* from Sterling Equipment, Inc. for purposes of moving gray and treated black water from the three Holland America cruise ships to the JEA'S Kennedy Generating Plant during the 2005 NFL Superbowl Week in Jacksonville. The three Holland America cruise ships discharged hundreds of thousands of gray and treated black water into Plaintiff's Barges *J Galli* and *Randi R* and these two Barges did not sustain any significant fecal coliform or E coli contamination. In particular, the treated black water discharged from the Holland America ships was nearly clear and odorless. Plaintiff, DANATUGS, was able to return the *J Galli* and *Randi R* to Sterling without incurring the major clean up and decontamination costs and other associated expenses that Plaintiff incurred with the *Cape Cod*. The aforementioned facts are alleged for purposes of showing that

the Defendants, CARNIVAL and *Miracle*, did not discharge properly treated black water into the *Cape Cod*.

37.     This Court is a proper venue to hear this dispute pursuant to Title 28 U.S.C. § 1391(b) and (c).

38.     Plaintiff, DANATUGS, has satisfied any and all conditions precedent for the filing of this action.

**COUNT I**
**NEGLIGENCE CLAIM AGAINST CARNIVAL AND THE *M/V MIRACLE***

39.     Plaintiff, DANATUGS. realleges paragraphs 1 through 38 of the Verified Complaint as if fully set forth herein.

40.     Defendants, CARNIVAL and *Miracle*, knew or should have known that they were required to only discharge treated black water into Plaintiff's Barge and that such treated black water was to be nearly colorless and odorless.

41.     Defendants, CARNIVAL and *Miracle*, owed a reasonable duty of care to protect Plaintiff, DANATUGS. from harm by not discharging untreated, or improperly treated. black water into Plaintiff's chartered barge named *Cape Cod*.

42.     Defendants, CARNIVAL and *Miracle*, breached their duty to use reasonable care to discharge only treated black water by:

(i)     Failing to adequately monitor the sewage treatment system on board the Vessel to insure it was operating properly before discharging untreated or improperly treated black water into the Barge *Cape Cod*:

(ii)    By-passing or overriding the sewage treatment system on

the Vessel so that untreated or improperly treated black

water was pumped off the Vessel into the Plaintiff's Barge

*Cape Cod*;

(iii)   Failing to test black water samples to verify the

effectiveness of the sewage treatment system before the

Vessel discharged untreated or improperly treated black

water into the Barge *Cape Cod*; or.

(iv)   Negligently misrepresenting to Plaintiff that the Vessel

would only discharge treated black water and that such

water would be nearly clear and odorless.

43.   As a direct and proximate result of Defendants, CARNIVAL'S and *Miracle*'s,

fault or omissions described in paragraph 42 above, Plaintiff, DANATUGS, sustained damages

in the form of clean up expenses to decontaminate the Barge *Cape Cod*, incurring additional

charter hire during the clean up period for the Barge, and other related expenses attributable to

the decontamination of the Barge.  Plaintiff, DANATUGS, damages are itemized in paragraphs

32 through 35 above.

WHEREFORE, Plaintiff, DANATUGS, demands this Court do the following:

a)   Take *in rem* jurisdiction over the *M/V Miracle*, her engines, tackle, apparel, etc.,

through the substitute security posted in the form of the letter of undertaking that is attached

hereto as Exhibit "A";

b)   That all persons having or claiming an interest therein may be cited to appear and

answer the aforesaid matter;

c)   That Plaintiff be decreed to have a lien upon the Defendant Vessel described

herein and that such lien be foreclosed in accordance with law;

     d)     That upon proper notice and hearing, judgment be entered against the *in rem* Defendant, *Miracle*, and the *in personam* Defendant, CARNIVAL, for damages together with prejudgment interest and costs;

     e)     That this Court further award Plaintiff, DANATUGS, the total amount due, pre-judgement interest and costs, and that Plaintiff be permitted to recover same from the *in personam* Defendant. CARNIVAL; and,

     f)     For such other and further relief as this Court deems just and proper.

**COUNT II**
***RES IPSA LOQUITUR* NEGLIGENCE CLAIM
AGAINST CARNIVAL AND THE *M/V MIRACLE***

     44.     Plaintiff, DANATUGS. realleges paragraphs 1 through 38 and 40 through 43 of the Verified Complaint as if fully set forth herein.

     45.     At all times material hereto. Plaintiff, DANATUGS, was without fault in regard to Defendants, CARNIVAL'S and *Miracle's*, improper discharge of untreated or improperly treated black water into the Barge *Cape Cod* on or about February 6, 2005.

     46.     At all times material hereto. the sewage treatment system on board the *Miracle* was under the exclusive control of Defendants, CARNIVAL and *Miracle*.

     47.     Defendants, CARNIVAL'S and *Miracle's,* discharge of untreated or improperly treated black water into the Plaintiff's Barge *Cape Cod* is the type of action that ordinarily does not occur in the absence of negligence.

     48.     The general maritime law recognizes *res ipsa loquitur* negligence claims. *Johnson v. United States*, 333 U.S. 46, 68 S. Ct. 391 (1948); *United States v. Baycon Indus., Inc.*, 804 F.2d 630 (11th Cir. 1986); *Rockey v. Royal Caribbean Cruises, Ltd.*, 2001 U.S. Dist. LEXIS

21886 (S. D. Fla. 2001).

WHEREFORE, Plaintiff, DANATUGS, demands this Court do the following:

a)　　　Take *in* rem jurisdiction over the *M/V Miracle*, her engines, tackle, apparel, etc., through the substitute security posted in the form of the letter of undertaking that is attached hereto as Exhibit "A";

b)　　　That all persons having or claiming an interest therein may be cited to appear and answer the aforesaid matter;

c)　　　That Plaintiff be decreed to have a lien upon the Defendant Vessel described herein and that such lien be foreclosed in accordance with law;

d)　　　That upon proper notice and hearing, judgment be entered against the *in rem* Defendant, *Miracle,* and the *in personam* Defendant, CARNIVAL, for damages together with prejudgment interest and costs;

e)　　　That this Court further award Plaintiff, DANATUGS the total amount due, pre-judgement interest and costs, and that Plaintiff be permitted to recover same from the *in personam* Defendant, CARNIVAL; and.

f)　　　For such other and further relief as this Court deems just and proper.

## COUNT III
## NEGLIGENCE *PER SE* CLAIM AGAINST CARNIVAL AND THE *M/V MIRACLE*

49.　　　Plaintiff, DANATUGS, realleges paragraphs 1 through 38 and 40 through 43 of the Verified Complaint as if fully set forth herein.

50.　　　The sewage treatment system on board the *Miracle* has a by-pass that enables the Vessel to discharge untreated or improperly treated black water from the Vessel's sewage collection tank(s) without the black water being processed through the Vessel's sewage treatment

system.

51.      At all material times hereto, the Code of Federal Regulations, 33 C.F.R. § 159.7, required Defendants, CARNIVAL and *Miracle*, to secure the seacock or valve for the relevant by-pass in a closed position so that untreated or improperly treated black water could not be discharged from the Vessel while it was in port.

52.      At all material times hereto, Defendants, CARNIVAL and *Miracle,* did not secure the seacock or valve for the relevant by-pass in a closed position to prevent the discharge of untreated or improperly treated black water while the Vessel was in port.

53.      Defendants, CARNIVAL'S and *Miracle's,* violation of the Code of Federal Regulation's requirement that by-pass seacocks and/or valves be secured in a closed position to prevent the discharge of untreated or improperly treated black water while the Vessel was in port directly or proximately resulted in the *Miracle's* discharge of untreated or improperly treated black water into Plaintiff's Barge *Cape Cod.*

54.      Defendants, CARNIVAL'S and *Miracle's,* violation of the Code of Federal Regulation's requirement that by-pass seacocks and/or valves be secured in a closed position while the Vessel was in port directly or proximately caused damages to Plaintiff by allowing untreated or improperly treated black water to be discharged from the *Miracle* into the *Cape Cod,* which caused Plaintiff to incur clean up and decontamination expenses for the Barge, additional charter hire for the period of time that the Barge required to be cleaned and/or decontaminated, and other expenses related to the clean up and/or decontamination of the Barge.  Plaintiff, DANATUGS, damages are itemized in paragraphs 32 through 35 above.

55.      Defendants, CARNIVAL'S and *Miracle's,* breach of the Code of Federal Regulations renders Defendants, CARNIVAL and *Miracle,* negligent *per se* and they have the

burden to show they are not at fault for the subject discharge.

WHEREFORE, Plaintiff, DANATUGS, demands this Court do the following:

a)    Take *in rem* jurisdiction over the *M/V Miracle*, her engines, tackle, apparel, etc., through the substitute security posted in the form of the letter of undertaking that is attached hereto as Exhibit "A";

b)    That all persons having or claiming an interest therein may be cited to appear and answer the aforesaid matter;

c)    That Plaintiff be decreed to have a lien upon the Defendant Vessel described herein and that such lien be foreclosed in accordance with law;

d)    That upon proper notice and hearing, judgment be entered against the *in rem* Defendant, *Miracle,* and the *in personam* Defendant, CARNIVAL, for damages together with prejudgment interest and costs;

e)    That this Court further award Plaintiff, DANATUGS, the total amount due, pre-judgement interest and costs, and that Plaintiff be permitted to recover same from the *in personam* Defendant, CARNIVAL; and,

f)    For such other and further relief as this Court deems just and proper.

## COUNT IV
## MARITIME TRESPASS CLAIM
## AGAINST CARNIVAL AND THE *M/V MIRACLE*

56.    Plaintiff, DANATUGS, realleges paragraphs 1 through 38 of the Verified Complaint as if fully set forth herein.

57.    At all material times hereto, Plaintiff, DANATUGS, was the demise charterer of the Barge *Cape Cod* and the owner *pro hac vice*.

58.    At all material times hereto, Plaintiff, DANATUGS, was entitled to the exclusive

possession and use of the Barge *Cape Cod*

59.     Defendants, CARNIVAL and *Miracle*, intentionally and unlawfully interfered with Plaintiff, DANATUGS', exclusive right to possession and use of the Barge *Cape Cod* by intentionally discharging untreated or improperly treated black water into the Barge, which rendered the Barge useless until the black water was pumped out and the Barge cleaned and decontaminated.

60.     As a direct and proximate result of Defendant, CARNIVAL'S and *Miracle's*, trespass, Plaintiff sustained damages consisting of clean up and decontamination expenses for the Barge, additional charter hire for the Barge during the clean up period and other expenses related to the clean up and decontamination of the Barge.  Plaintiff, DANATUGS, damages are itemized in paragraphs 32 through 35 above.

WHEREFORE, Plaintiff, DANATUGS, demands this Court do the following:

a)     Take *in rem* jurisdiction over the *M/V Miracle*, her engines, tackle, apparel, etc., through the substitute security posted in the form of the letter of undertaking that is attached hereto as Exhibit "A";

b)     That all persons having or claiming an interest therein may be cited to appear and answer the aforesaid matter;

c)     That Plaintiff be decreed to have a lien upon the Defendant Vessel described herein and that such lien be foreclosed n accordance with law;

d)     That upon proper notice and hearing, judgment be entered against the *in rem* Defendant and the *in personam* Defendant, for damages together with prejudgment interest and costs;

e)     That this Court further award Plaintiff the total amount due, pre-judgement interest

and costs, and that Plaintiff be permitted to recover same from the *in personam* Defendant; and

      f)     For such other and further relief as this Court deems just and proper.

## COUNT V
## MARITIME NUISANCE CLAIM
## AGAINST CARNIVAL AND THE *M/V MIRACLE*

61.     Plaintiff, DANATUGS, realleges paragraphs 1 through 38 of the Verified Complaint as if fully set forth herein.

62.     At all material times hereto, Plaintiff, DANATUGS, was the demise charterer of the Barge *Cape Cod* and the owner *pro hac vice.*

63.     At all material times hereto, Plaintiff, DANATUGS, was entitled to the exclusive possession and use of the Barge *Cape Cod*

64.     Defendants, CARNIVAL and *Miracle,* intentionally and unlawfully interfered with Plaintiff, DANATUGS', exclusive right to possession and use of the Barge *Cape Cod* by intentionally discharging untreated or improperly treated black water into the Barge, which rendered the Barge useless until the black water was pumped out and the Barge cleaned and decontaminated.

65.     Defendants, CARNIVAL'S and *Miracle's,* intentional discharge of untreated or improperly treated black water created a nuisance that prevented Plaintiff, DANATUGS, from being able to exercise its right to possession and use of the Barge *Cape Cod.*

66.     As a direct and proximate result of Defendant, CARNIVAL'S and *Miracle's,* intentional and unreasonable interference with Plaintiff, DANATUGS', use of the Barge *Cape Cod*, Plaintiff sustained damages consisting of clean up and decontamination expenses for the Barge, additional charter hire for the Barge for the period it had to be cleaned and decontaminated, and other related expenses attributable to the cleaning and decontamination of

the Barge. Plaintiff, DANATUGS, damages are itemized in paragraphs 32 through 35 above.

WHEREFORE, Plaintiff, DANATUGS, demands this Court do the following:

a)    Take *in rem* jurisdiction over the *M/V Miracle*, her engines, tackle, apparel, etc.,
through the substitute security posted in the form of the letter of undertaking that is attached
hereto as Exhibit "A";

b)    That all persons having or claiming an interest therein may be cited to appear and
answer the aforesaid matter;

c)    That Plaintiff be decreed to have a lien upon the Defendant Vessel described herein
and that such lien be foreclosed n accordance with law;

d)    That upon proper notice and hearing, judgment be entered against the *in rem*
Defendant and the *in personam* Defendant, for damages together with prejudgment interest and
costs;

e)    That this Court further award Plaintiff the total amount due, pre-judgement interest
and costs, and that Plaintiff be permitted to recover same from the *in personam* Defendant; and

f)    For such other and further relief as this Court deems just and proper.

**COUNT VI**
**INTENTIONAL MISREPRESENTATION CLAIM**
**AGAINST CARNIVAL AND THE *M/V MIRACLE***

67.    Plaintiff, DANATUGS, realleges paragraphs 1 through 38 of the Verified
Complaint as if fully set forth herein.

68.    The chief engineer on Defendant, CARNIVAL'S *Miracle*, advised Defendant,
JEA'S, representative and Plaintiff, DANATUGS' representative that "no untreated black water
would be discharged from the Vessel into the Barge" and that the treated black water would be
"nearly clear and odorless."

69.     Defendants, CARNIVAL and *Miracle*, intentionally made the aforementioned statements about the type and quality of the treated black water in order to induce Plaintiff, DANATUGS. into allowing the Vessel to discharge untreated or improperly treated black water into the Barge *Cape Cod*.

70.     Plaintiff. DANATUGS, justifiably relied to its detriment on Defendants, CARNIVAL'S and *Miracle's*, false statements of fact by allowing the *Miracle* to hook-up to and discharge its untreated or improperly treated black water into the Barge *Cape Cod*.

71.     Plaintiff, DANATUGS, sustained damages consisting of clean up and decontamination expenses for the Barge *Cape Cod*, additional charter hire for the Barge during the clean up period, and other related expenses as a direct and proximate result of Defendants, CARNIVAL'S and *Miracle's*, fraudulent misrepresentations that the black water would be treated to the point where it was nearly clear and odorless.  Plaintiff. DANATUGS, damages are itemized in paragraphs 32 through 35 above.

WHEREFORE, Plaintiff, DANATUGS, demands this Court do the following:

a)     Take *in rem* jurisdiction over the *M/V Miracle*, her engines, tackle, apparel, etc., through the substitute security posted in the form of the letter of undertaking that is attached hereto as Exhibit "A":

b)     That all persons having or claiming an interest therein may be cited to appear and answer the aforesaid matter;

c)     That Plaintiff be decreed to have a lien upon the Defendant Vessel described herein and that such lien be foreclosed in accordance with law;

d)     That upon proper notice and hearing, judgment be entered against the *in rem* Defendant and the *in personam* Defendant, for damages together with prejudgment interest and

costs;

e)      That this Court further award Plaintiff the total amount due, pre-judgement interest and costs, and that Plaintiff be permitted to recover same from the *in personam* Defendant; and

f)      For such other and further relief as this Court deems just and proper.

**COUNT VII**
**BREACH OF ORAL MARITIME CONTRACT CLAIM AGAINST THE JEA**

72.     Plaintiff, DANATUGS. realleges paragraphs 1 through 38 of the Verified Complaint as if fully set forth herein.

73.     Plaintiff. DANATUGS, entered an oral maritime contract with Defendant, JEA, to move gray and treated black water discharged from CARNIVAL'S *Miracle* and three Holland America cruise ships to JEA'S Kennedy Generating Plant on the St. John's River during the period of February 2 - 7. 2005, which was the week of the 2005 NFL Superbowl in Jacksonville, Florida. Defendant, JEA, agreed to promptly pump the waste water out of DANATUGS' barges once they arrived at the JEA'S Kennedy Generating Plant.

74.     Defendant. JEA, orally agreed to pay Plaintiff, DANATUGS, One Hundred Ninety Nine Thousand Eight Hundred Seventy Five and No/100 Dollars ($199.875.00) for its services.

75.     In addition to the $199,875.00 payment for Plaintiff's services, Defendant. JEA, orally agreed that it would pay Plaintiff, DANATUGS, for any charges and expenses that were over and above the expenses that were identified and appended to DANATUGS' Proposal dated January 21, 2005. A copy of Plantiff, DANATUGS', Proposal dated January 21, 2005 is attached hereto and made a part hereof as Exhibit "B."

76.     Defendant. JEA, breached its oral maritime contract with Plaintiff, DANATUGS, in the following manner:

     a.    Refusing to pay or reimburse Plaintiff. DANATUGS, for the additional charges, expenses and charter hire relating to the cleaning and decontamination of the *Cape Cod,* which charges and expenses are described in paragraphs 32 through 35 above;

     b.    Delaying the *Cape Cod's* discharge of the untreated or improperly treated black water at JEA'S Kennedy Generating Plant; and/or.

     c.    Refusing to pump out all of the untreated or improperly treated black water from the *Cape Cod* at the JEA'S Kennedy Generating Plant.

77.     Plaintiff, DANATUGS, sustained damages in the form of additional clean up and decontamination expenses for the *Cape Cod,* additional charter hire for the *Cape Cod* and other related expenses as a direct and proximate result of Defendant, JEA'S, breach of the aforementioned oral maritime contract. Plaintiff, DANATUGS, damages are itemized in paragraphs 32 through 35 above.

WHEREFORE, Plaintiff, DANATUGS, demands the Court enter judgment against Defendant, JEA, for compensatory and consequential damages, pre-judgment interest, costs and for such other and further relief as this Court deems proper.

Respectfully submitted,

STROUP & MARTIN, P.A.
Attorneys for Plaintiff
119 Southeast 12th Street
Fort Lauderdale, Florida 33316
(954) 462-8808; Fax 462-0278

By: _____
        FARRIS J. MARTIN, III
        Fla. Bar No. 0879916
        JAMES W. STROUP
        Fla. Bar No. 0842117

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NO.

D R FREED, INC. d/b/a
DANATUGS.COM,

      Plaintiff,

vs.

*M/V Miracle, in rem*; CARNIVAL
CORPORATION, a Panamanian
Corporation doing business under
the Trademark CARNIVAL CRUISE
LINES; and JACKSONVILLE ELECTRIC
AUTHORITY,

      Defendants.

_____/

## VERIFICATION

STATE OF FLORIDA    )
                 ) SS
COUNTY OF BROWARD  )

DANA FREED, being duly sworn, deposes and says:

1.    My name is DANA FREED, I am at least twenty-one years of age and the

President of Plaintiff, D R FREED, INC. d/b/a DANATUGS.COM, herein.

2.    I have read the foregoing Verified Complaint and know the contents thereof, and

the same is true to the best of my own knowledge and/or upon information and belief.

3.    The sources of my information are based upon my personal knowledge,

information given to me by other people who worked with me on the subject project, a review of the documents produced during discovery in a prior suit that was dismissed without prejudice and my observation of the deposition of the chief engineer for the *M/V Miracle* in a prior suit.

4.    I am authorized to make this representation on behalf of the Plaintiff, D R FREED, INC. d/b/a DANATUGS.COM.

Dated: October _19_, 2006.

_____
DANA FREED


SWORN TO AND SUBSCRIBED before me, the undersigned authority, on this _19_ day of October 2006, personally appeared DANA FREED who is personally known to me and who did take an oath that the contents of the Verified Complaint are true and correct to his knowledge and/or upon his information and belief.

_____
Notary Public

My Commission Expires:



CHRISTINA BRODER
MY COMMISSION # DD 320473
EXPIRES: May 18, 2008
Bonded Thru Budget Notary Services



West of England

Luxembourg

15 December 2005

DR Freed Inc.
d/b/a Danatugs.com
c/o STROUP & MARTIN PA
119 Southeast 12th Street
Fort Lauderdale
Florida 33316
USA

For the attention of DR FREED INC, D/B/A DANATUGS.COM

Dear Sirs

| | |
|---|---|
| Vessel: | CARNIVAL MIRACLE |
| Date: | FEBRUARY 2005 |
| Nature of Claim: | ALLEGED DAMAGE TO PROPERTY OF DR FREED INC. D/B/A DANATUGS.COM (United States District Court Case no 3:05-cv-1255-J-25-HTS) |

IN CONSIDERATION of and upon condition that you release and/or refrain from arresting or otherwise detaining the above vessel or any other vessel or property in the same or associated Ownership or Management to secure the above claim and that you refrain from commencing and/or prosecuting legal or arbitration proceedings (otherwise than before the court or tribunal referred to below) against the Owners of the above vessel, their servant or agents WE HEREBY undertake to pay you any sum inclusive of interest and costs not exceeding USD280693.24 (two hundred and eighty thousand six hundred and ninety three united states dollars and twenty four cents) which may either be agreed between the parties to be due to you in respect of the above claim or which may be adjudged to be due to you in respect of the above claim from the Owners of the above vessel by United States District Court, Middle District of Florida, Jacksonville Division, or any appeal therefrom.

Yours faithfully
For: West of England Insurance Services
       (Luxembourg) S.A.
       (As Managers)

M D Kelleher
Director

EXHIBIT

The West of England Ship Owners Mutual Insurance Association (Luxembourg)
OL-0S1211-E6-CEC-LOU-CARNIVAL MIRACLE,Danutugs.coRegistered in Luxembourg No: RCU 6963

Managers: West of England Insurance Services (Luxembourg) S.A.
Registered Office:
33 Boulevard Prince Henri
L-1724 Luxembourg
G.D. Luxembourg
T +(352) 4760671  F+(352) 225259

Email: mail@weogl.ancl.com

UK Branch:
Tower Bridge Court
224-226 Tower Bridge Road
London SE1 2UP
T +(44) (0)20 7716 6000  F +(44) (0)20 7716 6100

TOTAL  P.02

PROPOSAL FOR J.E.A. "SUPERBOWL" PROJECT
21 January 2005

It is our understanding that J.E.A. requires services from Danatugs to remove the Black/grey water from the 4 cruise ships that will be visiting Jacksonville during the Super bowl Feb 2 – 7, 2005. The following is our basic understanding of the scope of work:

Mission: Removal of waste waters, (Treated Black and grey, NO OIL or FUELS) from 4 cruise ships docked in the port of Jacksonville at the above specified dates. The ships are as follows:

Carnival Miracle, arrives 2 Feb, departs 7 Feb, docking at Dames Point Cruise ship terminal, discharges approximately 265,000 gals/day, estimated 1.3 million gallons for entire stay.

Holland America Zuiderdam, arrives 3 Feb, departs 7 Feb, docking at Talleyrand docks, discharges approximately 212,000 gals/day, estimated 850,000 gallons for entire stay.

Holland America Zaandam, arrives 3 Feb, departs 7 Feb, docking at Talleyrand docks, discharges approximately 113,000 gals/day, estimated 450,000 gallons for the entire stay.

Holland America Volendam, arrives 3 Feb, departs 7 Feb, docking at Talleyrand docks, discharges approximately 113,000 gals/day, estimated 450,000 gallons for the entire time.

## Proposal:

We intend to use several barges, by name, availability and US Coast Guard approval of the Equipment on 27 – 28 January 2005:

Cape Cod     250' x 72' x 16': alongside Miracle, (capacity 1.7 million gallons)

J. Galli     180' x 60' x 12': alongside Zuiderdam, (capacity 900,000 gallons)

Randy R      180' x 60' x 12': servicing Zaandam and Volendam, (capacity 900,000 gallons)

SEI 17       90' x 54' x 12': spud barge for staging barges positioned off Kennedy terminal.


Two of the product barges, ("CAPE COD" and "J.GALLI") will be moored alongside the larger vessels for the duration of the stay in Jacksonville. One product barge, ("Randy R") will be shared between the two smaller H.A.L. vessels. Each barge will be outfitted with a fender system (tires lashed to the sides of the barge) to protect the ship. Pumping will commence as soon as the ship has at least 30% – 50 % of treated product in their holding tanks. The ship will contact DANATUGS Command center and advise they are ready for a discharge. In accordance with local Coast Guard requirements, a tanker man will be placed on board the barge and pumping will commence and continue until the holding tank is emptied of treated product. A LOADING PROCEDURES checklist has been generated in accordance with the local Coast Guard request and will be followed to the letter.

EXHIBIT
B

The connection from the ship will be made from a standard 3" cam lock fitting attached to their discharge stations, (supplied by the ship) to a 3" flexible hose coupled to a 3" cam lock fitting on a 6" PVC manifold on the deck of the barge leading into the individual tanks. The 3" flexible hose shall be of sufficient length to compensate for the barges draft while loading and unloading. The manifold will be constructed out of 6" PVC, (schedule 40) piping leading down the centerline of the deck barge with fittings and valves connecting to 4" PVC piping coming off of the main line routed to the tanks of the barge. Tank penetration will be made through the tank lid and sealed with a silicon calk and a 2" PVC pipe tank vent will be placed in the tank lid also. The "stand pipe" into the tank will go into the barge to within 3" of the bottom of each tank. Each 4" line to the tank will be fitted with a 4" ball valve to control the flow to the individual tanks and will be able to isolate each tank as necessary. During loading/unloading operations, barges will be monitored by a tanker man, who will be in charge of the loading/unloading and stability of the barge. At no time will the barges be allowed to have more than a 10 degree list to either side. A LOADING PROCEDURE list has been generated and will be followed to the letter.

The barges will be moved by our tug, "Bantam", crewed by 2 licensed Captains and one deckhand. We will also have another tug, "Isabella C" to act as a standby tug and assist as necessary in the barge movements. Danatugs, Inc. will also provide a fast response crew boat to continually monitor the operation and provide crew relief and transportation for the supervisors to/from the barges as required by regulation. Our base of operations will be from an office trailer, provided by DanaTugs, parked at the Kennedy terminals, (at no cost to DanaTugs). The command center will monitor VHF Channel 10, (working channel) and channel 16. All DANATUGS personnel will have a VHF Radio primary communications and cellular phones that will act as back up communications with all personnel and units involved. A list of key personnel and contact numbers has been generated and will be distributed prior to getting underway for the project. Contact lists will be given to all DANATUGS units, the respective ships, JEA Personnel, and the Coast Guard duty office and security patrols as necessary.

No later than Sunday night, (6 Feb), or when full, the barges will be disconnected from the ship and moved to either Kennedy terminals for discharge, or to a spud barge off the Kennedy terminal awaiting pier space. Kennedy Terminals will have a 4" PVC line leading from the city connection to the docks. Each barge will be outfitted with a 4" diesel discharge pump connected by valve to the intake manifold onboard the barge. This service will be provided by JEA at no cost to DanaTugs. According to information received from the cruise lines, the respected ships can hold product for up to 2.5 days on board. Based on our calculations, we should not have to move the two larger barges during the stay in Jacksonville until Sunday night. All barges will be disconnected no later than Sunday night and moved into position on the spud barge awaiting discharge at Kennedy terminals. If a barge becomes full prior to Sunday night, the barge will be disconnected and the ship will shift to holding all material on board until the barge can come back along side. Based on the above calculations from the vessels, we should not have to pump any barges until Sunday night. An UNLOADING PROCEDURE checklist has been generated and will be followed to the letter. All cruise vessels will depart on Monday 7 February 2005.

These are our understandings and concept of the operation. We are submitting this based on **favorable USCG MSO JAX approval**. The Coast Guard MSO will be inspecting the barges on 28 January, (to approve the equipment and layout of the barges).

We understand that there will be no cost to Danatugs for dockage, use of the waterways, pilotage, customs, port costs, additional licensing, discharging at Kennedy terminals or any additional costs not outlined in this attached schedule of charges. Any additional cost will be for Jacksonville Electric Authority's account. This quote will remain in effect until 1200 local time on 26 January 2005 at which time we'll need a deposit into our account for a minimum of $100,000 USD.

The difference is the quote from the original $175,638 is due to additional insurance requirements and the type of barges that the US Coast Guard would accept for this type of operation. Originally we intended to use smaller barges that would have had to been moved several times during the ships time in port creating a security issues on the water side. By using the larger barges, we will not have to move but one barge during the entire stay of the vessels, thus eliminating a major security concern from the Coast Guard. The barges that we will be using can hold all of the product the ships will be delivering.

**Total Cost of this operation:**          **$199,875 USD**

Terms:   50% ($100,000 USD) to be paid on acceptance of this
         Proposal and contacts signed NLT 1200 Local time on 26 JANUARY 2005.

         50% ($99,875 USD) upon arrival of all tugs and barges at
         the jobsite.(NLT 2 February)

         Additional charges will be bill on a "net 10 days" terms.

Payment will be made by wire transfer into our account:

Name of Bank: Comerica Bank, 100 NE 3rd Ave, Ste 100, Fort Lauderdale, FL 33301  Phone: 954-468-0611 or 954-468-0605

Routing #:  067012099     Account #:  1811027711

Account Name:  D. R. Freed Inc.

---

Thank you for you time and consideration in this matter. I would appreciate any feedback at your earliest convenience. Note this proposal is for the liquid product from the Carnival and Holland America cruise lines. Any additional pick ups, Dry or regulated trash, will be billed by separate proposal.

Best regards:

Brad Winegard
DanaTugs, Inc.
brad@danatugs.com
salvagetug@aol.com
954-728-8631 office
954-610-5463 cell

| EQUIPMENT /SIZE | TYPE | QUANITY | VESSEL | COST | |
|---|---|---|---|---|---|
| To and from JAX | Mob/demob all boats and barges | 1 ea | | $49,000.00 | |
| Cape Cod: 250' x 72' x 16' | Liquid barge capacity 1,700,000 gls | 1 ea | Miracle | $24,000.00 | inc additional costs: tires, manifold system, and connections $4000/barge |
| J Galli 180' x 60' x 12' | liquid barge minimum capacity 900,000 gls | 1 ea | Zuierdam | $23,000.00 | inc additional costs: tires, manifold system, and connections $4000/barge |
| Randy R 180' x 60' x 12' | liquid barge minimum capacity 900,000 gls | 1 ea | Zaandam | $23,000.00 | inc additional costs: tires, manifold system, and connections $4000/barge |
| SEI 17 90' x 54' x 9' | Spud Barge for staging | 1 ea | spud barge | $7,000.00 | positioned off Kennedy terminal |
| 5,000,000 general liability | Insurance requirements | | | $17,000.00 | insurance requirements required by barge owners |
| 4 - 4" $500/WK/PUMP | discharge pumps | 4 | each barge | $6,000.00 | discharge  pumps for barges (3 WEEKS) |
| | Isabel C | 5 days | $1675/day | $8,375.00 | |
| | Bantam | 6 days | $2000/day | $12,000.00 | |
| | Crewboat | 5 days | $600/day | $3,000.00 | |
| | Additional labor for Docks and barges | 5 days | 2 x $250/day | $2,500.00 | tankermen required by CG |
| $300/day | Lodging /perdiem | 10 days | $300/day | $3,000.00 | |
| $250/day/sup; $200/day/man x 3 | Supervisor & ground crew | 10 days | $850/day | $8,500.00 | |
| 44' office | Office/Equip trailer | 10 days | $150/day | $1,500.00 | |
| | Barge Cleaning | 4 barges | $3000/ea | $12,000.00 | |
| | | | Sub TOTAL | $199,875.00 | |